FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Nov 19 2021

(USAO GAN 6/10)  Search Warrant

KEVIN P. WEIMER , Clerk

By: s/Kari Butler

Deputy Clerk

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

Nine electronic devices seized from the property located at 556 Stallings Road Trenton, GA 30752 on or about June 11, 2021

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**
Case number: 4:21-MC-90

I, James C. Fincher, being duly sworn depose and say:

I am an Inspector of the U.S. Postal Service and have reason to believe that in the property described as:

**Nine electronic devices seized from the property located at 556 Stallings Road Trenton, GA 30752 on or about June 11, 2021, as further described in Attachment A, incorporated herein by reference,**

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

**See Attachment B, incorporated herein by reference,**

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 18, United States Code, Sections 2261A, 875(b), and 922(o). The facts to support a finding of Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT**

Continued on attached sheet made a part hereof.

Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

_James C. Fincher_
Signature of Affiant

James C. Fincher

November 19, 2021
Date

Rome, Georgia
City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

AUSA Annalise K. Peters

_Walter E. Johnson_
Signature of Judicial Officer

I, James Casey Fincher, depose and say under penalty of perjury:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigator and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered to conduct investigations of, and make arrests for, offenses enumerated in Title 18 of the United States Code and other violations of federal law.

2.      I am currently employed as a United States Postal Inspector (Inspector) with the United States Postal Inspection Service (USPIS) and have been so employed since 2013. In May of 2009, I received a Master of Accountancy, with an emphasis in Forensic Accounting, from Florida Atlantic University.  Prior to my career with the USPIS, I served four years as a Special Agent with the U.S. Department of Housing and Urban Development – Office of Inspector General during which time I investigated white-collar crime with responsibility for investigating violations such as mail fraud, fraud by wire, bank fraud, and money laundering, including investigations of housing-for-profit and loan origination fraud. As a Postal Inspector, I have participated in physical surveillance, worked with confidential informants, conducted interviews, served subpoenas, and executed search and seizure warrants.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

4.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the seizure and examination of property—specifically, the following nine electronic devices:

- a Dell PowerEdge R710 Model E02S rack style computer,

- a BarraCuda 80 gigabyte hard drive,

- a Western Digital 2 terabyte hard drive,

- two (2) white SanDisk 32 gigabyte thumb drives,

- a red and black SanDisk Cruzer Blade 16 gigabyte thumb drive,

- a black SanDisk Cruzer 4 gigabyte thumb drive with "KOB" etched into the top,

- a PNY Elite Portable SSD 480 gigabyte external hard drive, and

- a Netac 8 gigabyte SD memory card,

(collectively, the SUBJECT DEVICES), as further described in Attachment A, incorporated herein by reference.  The SUBJECT DEVICES were seized from the property located at 556 Stallings Road Trenton, GA 30752, and are believed to be owned by KEVIN BURRESS.  The SUBJECT DEVICES are currently in the custody of the Dade County Sheriff's Office located in Trenton, Georgia.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C §§ 2261A (cyberstalking), 875(b) (extortionate threats), and 922(o) (possession of a machinegun) have been committed by KEVIN BURRESS (BURRESS). There is also probable cause to search the SUBJECT DEVICES for evidence, instrumentalities, contraband, or fruits of these crimes, as further described in Attachment B.  The applied-for warrant would authorize the forensic examination of

the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## NATIONAL FIREARMS ACT

6.     The National Firearms Act ("NFA") regulates the manufacture, possession, and registration of certain weapons defined under the Act, generally referred to as NFA Firearms. NFA Firearms include, among other things, short-barreled rifles (SBRs), suppressors, short-barreled shotguns, and machineguns. *See* 26 U.S.C. § 5845(a).

7.     The Gun Control Act ("GCA") defines a "firearm" as: (A) any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. 18 U.S.C. § 921(a)(3).

8.     For purposes of NFA regulations, the NFA defines a "firearm" as: "(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title18, United States Code); and (8) a destructive device." 26 U.S.C. § 5845(a).

9.     The NFA defines a "machine gun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination

3

of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. 26 U.S.C. § 5845(b).

10.     An auto sear is a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  The Bureau of Alcohol, Tobacco and Firearms ("ATF") has examined an auto sear known by various trade names including "AR15 Auto Sear," "Drop In Auto Sear," and "Auto Sear II," which consists of a sear mounting body, sear, return spring, and pivot pin. The ATF finds that the single addition of this auto sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles into machineguns as defined under the NFA. Consequently, the auto sear is a machinegun as defined by 26 U.S.C. § 5845(b). *See* ATF Rule 81-4.

11.     Any NFA weapon must be registered with the National Firearms Registration and Transfer Record ("NFRTR"). 26 U.S.C. §§ 5812(a), (b).

12.     Title 18, United States Code, Section 922(o) prohibits, with exceptions, any person from transferring or possessing a machinegun.

## PROBABLE CAUSE

13.     There is probable cause to believe that beginning in or around November 2019 until on or about October 14, 2021, BURRESS repeatedly contacted A.K., J.K., and M.K.[1], family members who resided in the Chicago, Illinois area, by telephone, email, USPS mail, and social media messages.  BURRESS repeatedly contacted these individuals using various phone numbers, email accounts, and other methods in an effort to harass and intimidate A.K. and to attempt to induce A.K. into marrying him.

---

[1] The names of these individuals and the name and identifying information about these individuals' business have been redacted to protect the victims' identities.

4

14.     According to USPS business records, BURRESS has an internet based USPS.com

postal account with the following information:

    a.     User ID:      trustedskies
    b.     First Name:   Kevin
    c.     Last Name:   Burress
    d.     Address:      556 Stallings Road Trenton, GA 30752
    e.     Phone:       916-201-8544
    f.      email:        mekevin1917@gmail.com

15.     A.K., J.K., and M.K. own and operate an art company that, during the relevant

time, held a business address of a P.O. Box located in Highland Park, Illinois.  The art company

maintains an online-only storefront that advertises and sells original, print, and various

merchandise related to artwork.

16.     On or about December 18, 2020, A.K. and J.K. filed a complaint with the Chicago

Police Department ("CPD") about BURRESS's conduct.  A.K. and J.K. reported that from

November 25, 2019 through December 18, 2020, they received approximately 100 to 300 emails,

three to four telephone calls, two voicemails, and 40 to 50 Facebook messages from a male

stating that he would kill A.K., J.K., and other family members with a gun and that he would

throw acid on A.K.'s face.  A.K. and J.K. also reported that the male said that he intended to

marry A.K. and if A.K. did not comply, he would make good on his mentioned threats.  The

voicemails were sent to the art business's publicly available phone number.  Additionally, the

male self-identified in his various messages as "KEVIN OWEN BURRESS," and he contacted

A.K. and J.K. using email accounts mekevin1917@gmail.com and

m.ek.e.vi.n1.91.7@gmail.com.

17.     On or about August 20, 2021, I interviewed A.K., J.K., and M.K. telephonically

to obtain information regarding communications they have received from BURRESS. They

reported that, to their knowledge, they have never met BURRESS or seen him in person.  J.K.

reported that over the course of receiving communications from BURRESS, BURRESS's communications became more frequent and seemed to escalate in their threatening nature.  J.K. estimated that the family has received hundreds of voicemails and thousands of emails from BURRESS.  The family members also reported that they took BURRESS's statements seriously and feared that BURRESS would harm them.  J.K. reported that even after he talked to BURRESS on the phone once and told BURRESS to stop contacting them, BURRESS continued sending messages and leaving voicemails.  According to A.K., J.K., and M.K., BURRESS's statements caused A.K. to fear for her safety and suffer emotional distress.

18.     During this investigation to date, I have personally reviewed various emails, voicemails, and postcards that were provided to law enforcement by J.K. and believed to be from BURRESS.  In some of the communications, BURRESS self-identifies as KEVIN or KEVIN BURRESS.  In others, he self-identifies as "Gabriel" or the "arch angel Gabriel."  In others, he self-identifies as both BURRESS and Gabriel.

19.     In my review of communications from BURRESS, I observed that around the spring of 2021, BURRESS's communications started to become more threatening and specific. BURRESS began claiming that he was preparing to travel to Chicago on a Greyhound bus, go to the Waldorf Astoria Hotel, and take and kill hostages on A.K.'s birthday unless A.K. agreed to marry or be with BURRESS.  BURRESS made specific claims that he was preparing certain weapons for the event.

**Use of Mail**

20.     The postcards I have reviewed have a personal message on one side and a photograph on the other side.  Many, if not all of the postcards, contain a logo showing that they were printed and sent by Postable, an online mail service where the sender pays, uploads a photograph for the front of the postcard, and submits a message for the back of the postcard.

6

Postable then prints and mails the postcard to the requested recipient on behalf of the sender. Records obtained from Postable also confirmed that BURRESS purchased and sent A.K. numerous postcards through Postable.  Many, if not all of the postcards, were addressed to A.K. and sent to one of a few addresses in the Chicago, Illinois area, where they were received by A.K., J.K., and/or M.K.

21.     For example, two USPS mailed postcards, dated February 7, 2020, were addressed to A.K., have the following photograph and message:

a.     With an image of two gazelles, one infant and one mature, the postcard states, "[A.K], Maybe tomorrow you will say yes. You didn't say no today. I will continue trying and pray and hope that you will find it to speak to me. I don't know what to expect really or what you would say but maybe you will find it, and maybe you will find time. Maybe you will care to treat me with any dignity at all and recognize that I exist, whether or not you believe that I am who I am. I have a lot of patience to keep trying. Maybe tomorrow I will get it right and I will come up with the right thing to say. I know not everything I think is pleasant or correct to do. I do a lot of thinking, and thinking, and thinking. Hope is like the forced swimming test on lab rats. The JP Morgan hiring the single mom running a $500/mo deficit in a one bedroom apartment if SF to work at a bank as a teller.  Any you, you're like the woman who is kidnapped and defends her captors.  Stockholm syndrome they call it.  I love you though. Maybe I'm the victim of your silence.  Gabriel (Kevin)."

b.     With an image of "VeraBitotic Live Longer," logo, the postcard informing A.K. that the sender submitted her to be a TEDx speaker.  The send closed the message out with, "- <3 KB".

22.     Below are additional examples of postcards that the family received along with the dates on the postcards:

a.     February 13, 2020: "I'm really trying to show you that I love you and I'm having a hard time with it," and, "I don't trust my family and I'm not sure I would miss them if they died.  But I would miss you and I want to trust you."

b.     February 26, 2020: "AA [Arch Angel] Michael said that you will lose power. California said they do not want people who wish to use Marijuana to have guns. Brian uses Marijuana and has guns," and closes with, "Gabriel."

c.      February 29, 2020: "…And your paintings are portals for demons to enter the earth and possess people. I think the Jesus one is maybe that carpenter but its there for people to pay you for protection from your demonic possessions and I'm not okay with it. I'm not paying for protection."

d.      March 17, 2020: "We kill people for free. You can't change that about me. You can reason with me. We don't want anyone killing us back it's a pain coming down here and we'll kill more people if they do. Do you want to be friends? You can change something but you can't change me.  Let's be reasonable. I want a wife."

e.      May 22, 2020 and with a picture of A.K. on the front: "…this is one of my favorites. Thank you for catching on about sending periodic messages with images.  It's nice to see you.  I like the other ones too but you seem a little sad… I was laying down just thinking of you and praying Elyon Thank you for this woman she makes me feel loved I can feel it in my spirit around her and it reaches to my being, even here. I want to send you a piece of mushroom, just once, and not a lot but a safe amount, and I hope you can have a great day and feel loved.

f.      April 30, 2021, and with an image of a dyrad cipher, the postcard states, "I'm killing myself. 21 bullets to the head in front of the white house. I'm disappointed. You should really talking."

g.      April 6, 2021,  and with an image of a AR15 in a deconstructed M state, it states, "I got some ammo today. It's strange thinking one of these bullets will most certainly be my death.  I know we should be quiet about that plan to kill the president the rich trump conservative….I've wanted to make art but I won't without you. Other than this plan you have me doing. It's too bad if the plan called for something better and more effective than 3d print guns. I guess those gun manufacturers really want it done for joe."[2]

h.      April 6, 2021, and with an image of two blank canvases leaning against a window, the postcard states, " I've had these canvases since I begun messaging you in June 2019. I bought them just around the time you posted your video about Everlasting."[3]

i.      April 28, 2021, and with an image of a dart board with a bullseye it states, "You still want me to go through with it and it's the same difference. They do too it files the agenda and you sent your brother to ask and I agree to it…I have the parts on the way. Arriving shortly. It was kind of a heavy buy but totally worth every penny to do, just wanted to keep it legal.  The new ghost gun ar pistol should fit well in my ukulele case."

---

[2] As set forth below, ammunition, a 3D printer, and a 3D printed Glock-style purple firearm base were recovered from BURRESS's trailer in Trenton, Georgia.

[3] As set forth below, two blank canvasses were recovered from BURRESS's trailer in Trenton, Georgia.

j.      May 11, 2021 and with an image of the print "Decay and Her Lustful Tongue," the postcard states, "The only thing that will shut me up is loving you and being together or dying. I think I'm going to send you some LSD but that solves nothing.  If I had a million dollars I would spend it all to find you…I can be good to you. You know. I can keep looking for fentanyl in the meantime.  I have a gun.

k.      June 9, 2021 and with an image of "anti art," the postcards states, "I want your fingers cut off and given to me.  The fingers of your self and your hand that you paint with. If you refuse. I want host taking and mass.  All ten fingers removed permanently and you in prison."

## Use of Email

23.      J.K. reported that many of the thousands of emails that are believed to have been

sent by BURRESS were sent to the art business's primary business email account.  Specifically,

many of those emails were likely "sent" by BURRESS by completing and submitting a form on

the art business's public website through the "contact us" page of the website.  The form

includes fields to list the submitter's name, email address, phone number, and message.  Notably,

J.K. reported that the email address entered into the form by the sender is not verified by the

system and could be a fictious email address.  Below are examples of emails I have reviewed to

date with the information believed to have been submitted by BURRESS:

    a.        Date:   December 4, 2020
                      Name: Obsession with Jodie Foster
                      Phone: 9162018534[4]

Hinckley became obsessed with the 1976 film Taxi Driver, in which disturbed protagonist Travis Bickle (Robert De Niro) plots to assassinate a presidential candidate. The Bickle character was partly based on the diaries of Arthur Bremer, who attempted to assassinate George Wallace.[4] Hinckley developed an infatuation with Jodie Foster, who played a sexually trafficked 12-year-old child, Iris Steensma, in the film.[8] When Foster entered Yale

---

[4] This number is one digit off of BURRESS's known cell phone number.  I believe that BURRESS mistyped his phone number when submitting this contact.

University, Hinckley moved to New Haven, Connecticut, for a short time to stalk her.[2] There, he slipped poems and messages under Foster's door, and repeatedly called and left her messages.

Message: Failing to develop any meaningful contact with the actress, Hinckley fantasized about conducting an aircraft hijacking or committing suicide in front of her to get her attention. Eventually, he settled on a scheme to impress her by assassinating the president, thinking that by achieving a place in history, he would appeal to her as an equal. Hinckley trailed President Jimmy Carter from state to state, and was arrested in Nashville, Tennessee, on a firearms charge. Penniless, he returned home. Despite psychiatric treatment for depression, his mental health did not improve. He began to target the newly elected president Ronald Reagan in 1981. For this purpose, he collected material on the assassination of John F. Kennedy. Hinckley wrote to Foster just before his attempt on Reagan's life:[9] Over the past seven months I've left you dozens of poems, letters and love messages in the faint hope that you could develop an interest in me. Although we talked on the phone a couple of times I never had the nerve to simply approach you and introduce myself. … The reason I'm going ahead with this attempt now is because I cannot wait any longer to impress you. — John Hinckley Jr. Thanks

b.     Date:   December 15, 2020
       Name: Crazy
       Email: mekevin1917@gmail.com
       Phone: 9162018544
       Message:  I mean biden is president and you're not my wife that's good enough reason to kill you.

c.     Date:   January 10, 2021
       Name: Over [A.K.]
       Email: neilwingstrong+[A.K.]@gmail.com
       Phone: She doesn't think I'll do it. That I'll die over her not being with me. I will though. I'm going to kill some cops first though.
       Message:  Maybe high profile like a federal judge or some mayor. Highland Parks mayor..something about her not obeying Jesus, how [J.K.] wants to kill people for Satan, and him being a fraud though, judge, mayor. Thanks.

**Use of Telephone**

24.     Below are transcriptions of selected voicemails provided by J.K. to law enforcement that are believed to have been left by BURRESS.[5]  The exact dates of these voicemails are unknown, but J.K. reported that they were left more recently:

> a.     "I got my glock 3d printed. Nice purple frame. It could be a little bit better, it has some lines in it…It shouldn't be a problem though. It should all work. It should go together."
>
> b.     "I'm serious that's the only thing you ever need to say, is leave….So I've got this Glock frame printed out now, it seems sturdy enough….Seems sturdy enough to use…It should be good for a few for what I'm using it for…a few hundred rounds of ammunition…Check out all my magazines make sure they cycle well….Brushed it with some sandpaper….Purple…Majestic purple…Its just for the whore of Babylon…just for her."
>
> c.     "Thought about using zip ties and zip tying  the explosives around people's neck…first tying them up…like a blow their head off collar…like a dog collar."
>
> d.     "Ya I'm going to the Waldorf. I'm going to take a Greyhound out there….Ship myself a gun or just take it on the Greyhound…and I'll come out there and get a room at the Waldorf and just start taking hostages…"

**Arrest of BURRESS and Seizure of SUBJECT DEVICES**

25.     On June 11, 2021, I assisted the Dade County Sheriff's Office ("DCSO"), the Georgia Bureau of Investigations ("GBI"), and the Georgia State Patrol SWAT ("GSP") with serving a State of Georgia arrest warrant for obstruction (Warrant Number 2110006A) for BURRESS and executing a search warrant issued by the Dade County Magistrate Court (Warrant Number 210611626) at BURRESS's trailer located at 556 Stallings Road, Trenton, GA 30752.  BURRESS was arrested and taken into state custody.[6]

---

[5] These are draft transcriptions.

[6] BURRESS was later moved into federal custody pursuant to a federal complaint (Case No. 4:21-MJ-51-WEJ).  Subsequently, on November 4, 2021, a federal grand jury returned a four-

26.     During the search of the trailer after BURRESS was arrested, law enforcement recovered the SUBJECT DEVICES, as well as the following: (1) a "Creality Ender 3" 3-D printer and three spools of 3D printer printing media in colors violet, silver, and black; (2) an AR15 style rifle void of manufacturer's indicia, proof markings, or serial numbers with a violet/purple item believed to be an auto sear attached to the firearm; (3) a violet/purple Glock style 3D printed firearm frame with A.K.'s name written on the firearm in black marker; (4) multiple types of ammunition, including suspected armor-piercing ammunition; (5) a box of zip tie handcuffs; (6) a pair of metal handcuffs engraved with A.K.'s name; (7) two blank art canvasses; (8) various firearm magazines and firearm parts; and (9) items with A.K.'s name and/or photograph on them.

27.     Based on the evidence recovered and communications from BURRESS to A.K. and J.K., there is probable cause to believe that BURRESS used the 3-D printer to create the purple Glock firearm frame and the suspected auto sear.

28.     On June 16, 2021, I inspected the "AR15" style rifle and observed the following:

a.     The barrel is a picatinny rail approximately ten point five inches (10.5") in length;

b.     There are no manufacturer markings, proof markings, or serial numbers located on the rifle, nor were there areas where the indicia was scratched out or obviously removed; and

c.     a violet/purple 3D printed "AR15" part, believed to be an auto sear, is placed onto the bolt of the rifle.

---

count indictment charging BURRESS with two counts of cyberstalking (A.K. and J.K.), sending an extortionate threat to J.K., and possession of a machinegun (Case No. 4:21-CR-41).

29.     On or about July 20, 2021, ATF Special Agent Stephen M. Kirkpatrick took possession of the suspected machinegun seized from BURRESS. The weapon was transported by SA Kirkpatrick to the ATF Atlanta Field Office, where it was visually inspected and entered into the ATF evidence system. SA Kirkpatrick inspected the weapon and believes that, based on his training and experience, the installed part appears to be a manufactured auto-sear designed to convert the semi-automatic firearm into a machine gun.  SA Kirkpatrick submitted the firearm to the ATF Firearms and Ammunition Technology Division (ATF-FATD) for examination and final determination by the Firearms Technology Criminal Branch (FTCB).

## Electronic Storage and Forensic Analysis

30.     This affidavit is made in support of authorization to search and seize items outlined in Attachment B, including records and information on the SUBJECT DEVICES.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

31.     For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, tape and/or CD-ROM and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data, and its corresponding evidentiary value, is lost when a computer is powered-off and unplugged.

32.     Based on my training and experience, I know that, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates that files were created and the sequence in which they were created.

33.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in

14

space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

34.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how the computers were used, the purpose of their use, who used them, and when they were used.

35.     In cases like this one, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any application software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

36.     Similarly, files related to the crimes outlined in the warrant found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants showing the identity of the person engaging in the conduct as well as the method of location or creation of the files, search terms used, and exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

37.      "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

38.      I know from my training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same Internet Protocol ("IP") address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

39.      Searching computers for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of the premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of these premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack

space.  This, too, makes it exceedingly likely that in this case it will be necessary to use techniques that are more thorough.

40.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:

a.    *The nature of evidence*: As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b.    *The volume of evidence*:  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or

17

months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.   *Technical requirements*:  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.   *Variety of forms of electronic media*:  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

## <u>CONCLUSION</u>

41.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICES described in Attachment A to seize the items described in Attachment B.

42.    Finally, because this warrant seeks permission to examine devices that are already in law enforcement's possession, the execution of the warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

**End of Affidavit**

**ATTACHMENT A**

**Property to be Searched**

The property to be searched are the following nine electronic devices:

- a Dell PowerEdge R710 Model E02S rack style computer,

- a BarraCuda 80 gigabyte hard drive,

- a Western Digital 2 terabyte hard drive,

- two (2) white SanDisk 32 gigabyte thumb drives,

- a red and black SanDisk Cruzer Blade 16 gigabyte thumb drive,

- a black SanDisk Cruzer 4 gigabyte thumb drive with "KOB" etched into the top,

- a PNY Elite Portable SSD 480 gigabyte external hard drive, and

- a Netac 8 gigabyte SD memory card,

(collectively, the SUBJECT DEVICES), which were seized from the property located at 556 Stallings Road Trenton, GA 30752 on or about June 11, 2021, and are believed to be owned by KEVIN BURRESS.  The SUBJECT DEVICES are currently in the custody of the Dade County Sheriff's Office located in Trenton, Georgia.

**End of Attachment A**

## ATTACHMENT B

## Property to be Seized

All records and information that constitute contraband or evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 2261A (cyberstalking), 875(b) (extortionate threats), and 922(o) (possession of a machinegun), including:

1. Electronic communications including, but not limited to, text messages, e-mail messages, application-based text messages, application-based video or picture messaging, as the messages relate to communication with or about A.K., J.K., M.K., or other members or associates of the K. family;

2. Records evidencing the use internet to communicate with A.K.'s online business webpage or submitting messages to the K. family through the online business webpage;

3. Personal identifying information of A.K., J.K., M.K., and other members of the K. family;

4. Contact lists, as they pertain to communication with or about A.K., J.K., M.K., or other members or associates of the K. family;

5. Video and pictures, as they pertain to A.K. or the K. family;

6. Internet history, as it pertains to A.K., J.K., M.K., or other members or associates of the K. family, making plans to visit Chicago, or the purchase or manufacturing of firearms or firearm related parts, including auto sears;

7. 3D printing designs, internet searches, research, and software related to 3-D printing, including the 3D printing of firearms and firearm related parts;

8. Digital notes that pertain to A.K., J.K., M.K., or other members or associates of the K. family;

9. Any stored digital documents such as stories, diaries, or letters that pertain to A.K., J.K., M.K., or other members or associates of the K. family;

10. Log files from applications that can be used for communication and/or file sharing as it pertains to A.K., J.K., M.K., or other members or associates of the K. family;

11. Any stored digital documents for the booking of travel or purchase of firearms, ammunition, or firearm-related parts;

12. Information showing BURRESS's schedule, travel, and intended or planned travel from November 2019 until his arrest on or about June 11, 2021;

13. Any files, documents, or information that show ownership of the items to be searched;

14. Evidence of utilization of email accounts, social media accounts, and online chat programs, including any account/user names;

15. Passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT DEVICES**;

16. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **SUBJECT DEVICES**;

17. Records of or information about Internet Protocol addresses used by the **SUBJECT DEVICES**;

18. Records of or information about the **SUBJECT DEVICES'** Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

19. Evidence of user attribution showing who used or owned the **SUBJECT DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and any physically created evidence (such as writings in a notebook).

**End of Attachment B**